## HOLLINGSWORTH *v.* AUTO SPECIALTIES MANUFACTURING COMPANY.

1. WORKMEN'S COMPENSATION—NOTICE OF INJURY—REPORT OF INJURY—CLAIM FOR COMPENSATION—TIME—EVIDENCE.

    Claimed error on part of workmen's compensation appeal board, in making findings that a timely report of the accident had been made to defendant and that timely claim for compensation had been made by plaintiff, working at common labor at dry-sand mold inspection job when she received a head injury while passing beneath an overhead conveyor, *held,* without merit, where evidence supported findings made and showed that defendant had not filed a report of the injury, and the evidence on such issues was in sharp dispute (CL 1948, § 412.15).

2. SAME—CREDIBILITY OF WITNESSES—WORKMEN'S COMPENSATION APPEAL BOARD—SUPREME COURT.

    The credibility of witnesses on issues of fact presented in proceedings to recover workmen's compensation is for the workmen's compensation appeal board, not the Supreme Court (CL 1948, § 413.12).

3. SAME—PROXIMATE CAUSE—HORSEPLAY—NONPARTICIPATING EMPLOYEE AS VICTIM—EVIDENCE.

    Claim that award of compensation to plaintiff for head injury she received while passing beneath an overhead conveyor was barred because it resulted from "horseplay" activities of some unknown young boy *held,* without merit, where evidence supported finding of workmen's compensation appeal board that it was not the result of such activity and there is no evidence that plaintiff had participated in the horseplay, if any existed (CL 1948, § 413.12).

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 58 Am Jur. Workmen's Compensation § 530.
[3] 58 Am Jur, Workmen's Compensation § 268.
  Workmen's compensation: Right to compensation in case of injuries sustained through horseplay or fooling.  13 ALR 540, 20 ALR 882, 36 ALR 1469, 43 ALR 492, 159 ALR 319.
[5] 58 Am Jur, Workmen's Compensation § 499 *et seq.*

4. SAME—TIME OF INJURY—PROXIMATE CAUSE—FINDINGS OF WORK-
MEN'S COMPENSATION APPEAL BOARD—EVIDENCE.

> The findings of the workmen's compensation appeal board as
> to time when claimant received her head injury and the causal
> connection of plaintiff's present condition with the injury
> *held,* supported by competent evidence (CL 1948, § 413.12).

5. SAME—WORKMEN'S COMPENSATION APPEAL BOARD—REFEREES—
EVIDENCE.

> The workmen's compensation appeal board, on appeal from an
> award by a referee, does not necessarily have to have other
> testimony before it than that presented to the referee before it
> dare make any findings or reach a contrary award, sim-
> plicity and dispatch being twin goals of the administration
> of the workmen's compensation act.

6. SAME—CONTINUING TOTAL DISABILITY—LAPSE OF TIME BETWEEN
PRESENTATION OF EVIDENCE AND FINDING BY WORKMEN'S COMPEN-
SATION APPEAL BOARD—DUE PROCESS.

> Finding of workmen's compensation appeal board that plaintiff's
> total disability as of January, 1957, was due to head injury
> received in November, 1951, upon medical testimony received
> by the referee in June, 1954, *held,* supported by competent
> evidence, where the nature of the nonspecific-loss injury is
> such as nevertheless to progressively worsen with the passage
> of time, hence, defendant employer who could have presented
> additional testimony but -failed to do so may not claim a
> lack of due process because of an adverse decision by the
> board, solely by reason of such a lapse of time between the
> presentation of the evidence and making an award for con-
> tinuing disability as of the later date (CL 1948, § 413.12).

Appeal from Workmen's Compensation Appeal
Board. Submitted January 9, 1958. (Docket No. 35,
Calendar No. 47,406.) Decided April 14, 1958.

Maxine Wall Hollingsworth presented her claim
for compensation from Auto Specialties Manufac-
turing Company because of head injury. Award to
plaintiff. Defendant appeals. Affirmed.

*Robert S. Feldman,* for plaintiff.

*John L. Crow,* for defendant.

VOELKER, J. This is an appeal by the employer defendant from a workmen's compensation award of total disability to the plaintiff made by the appeal board in reversing an order of no compensation by the referee. Many of the salient facts and most of the questions in this case can perhaps best be projected by quoting the opinion of the appeal board which, to avoid altering quotation marks, we give "as is" as follows:

\*    \*    \*

Plaintiff started working for defendant on November 10, 1947. She was assigned to a dry-sand mold inspection job. Plaintiff testified that previous to injury in November, 1951, she had only casual headaches which did not prevent her from working and that she had no fainting spells.

Plaintiff testified that on the Wednesday immediately preceding Thanksgiving Day, 1951 she started for the core room to obtain core rings which required that she duck her head in proceeding under a conveyor line; that in so doing she was struck on top of the head by the conveyor and rendered unconscious.

It appears that an unidentified employee was hanging onto or holding the conveyor at the time of the impact and that his act could have been horseplay. Plaintiff testified that this employee could have been straightening a core. The record does not establish that horseplay occurred or that the act of the unknown employee precipitated or brought about the injury. We find that plaintiff sustained an accidental injury arising out of and in the course of her employment.

Plaintiff's husband, James Hollingsworth, was her foreman at the time of injury. It is clear and we find that he had knowledge concerning the accidental injury within a few minutes of its occurrence. Such notice and knowledge is imputable to the employer. James Hollingsworth was no less a representative of the employer because he was the husband of plain-

tiff. Mrs. Hollingsworth was promptly taken to defendant's first-aid department where she reported the injury to Louise Brand, industrial nurse.

We find that defendant had notice and knowledge of the plaintiff's accidental injury on the date of its occurrence. No report of injury was filed by the employer. Plaintiff's application for hearing filed on May 1, 1953, and served on May 7, 1953, was timely. We find that statutory requirements relative to notice of injury and claim for compensation have been properly met.

Plaintiff testified that after lying down for 1-3/4 hours in first aid on the date of injury she returned to her job and finished out the day; that she remained in bed all week end; that she worked the following Monday but became very ill and that on Monday night she had a choking spell and a doctor was called; that she subsequently telephoned in to defendant's guardhouse and reported concerning her illness and inability to return to work. It is undisputed that plaintiff was off work from December 6, 1951 to March 3, 1952. She had not worked from March 25, 1952, to the time of hearing.

Plaintiff testified as to symptoms continuing during the period from the time of injury to the date of hearing including severe headaches, chest pains, black-out spells, choking spells and a paralyzed feeling on her left side. Plaintiff was seen by certain doctors in her own area and also at the Mayo Clinic.

The only medical testimony was furnished by Dr. Martin E. Feferman, neurosurgeon, who first examined plaintiff on July 15, 1953. Dr. Feferman again saw plaintiff on May 4, 1954, and caused her to be hospitalized between May 8 and May 16, 1954, during which time a pneumo-encephalogram was performed. His testimony includes the following:

"*A.* Well, first of all the history I received was that she was struck on the left side of the head in November of 1951. Following that she developed severe headaches and vomiting, which lasted for several days. She then noticed weakness of her left

extremities. Her headaches and weakness have persisted, and in addition she has had 'fainting spells,' and she stated that during one of these fainting spells she urinated, making the spell sound like true convulsions. She also stated that she was told that she becomes 'blue' when she has these spells.

"She has not been able to do too much since the accident because of the continuous headaches, dizziness and weakness. * * *

"*A.* My diagnosis at that time was post-traumatic head injury symptoms, and post-convulsive disorder.

"*Q.* Doctor, would you continue, giving us the examinations you performed?

"*A.* Following her visit to the office on the 4th of May, I recommended that she be hospitalized and she was hospitalized in Memorial hospital in South Bend, Indiana, on May 8, 1954.

"*Q.* How long was she in the hospital?

"*A.* Until the 16th of May.

"*Q.* Did you perform any further investigation?

"*A.* Yes, sir.

"*Q.* What was the nature of that investigation?

"*A.* I did a spinal tap on the 9th of May which revealed a normal pressure, and normal examination of the spinal fluid. A pneumo-encephalogram was performed on the 11th of May, 1954, which revealed marked evidence of brain injury in the left brain.

"*Q.* Any other examinations?

"*A.* No, sir, the last I saw her was on the 16th of May, 1954.

"*Q.* Now reviewing the total of your examinations, and the history given to you, and including your hospital examinations, do you have a diagnosis, Doctor?

"*A.* Yes, sir. My diagnosis at the present time is brain atrophy, probably convulsive disorder, and headaches associated with the brain damage.

"*Q.* I will ask you as to whether or not this might or could have been caused by a trauma?

"*A.* I believe this could have been caused by a trauma, yes, sir.

"*Q.* I will ask you as to whether or not a blow to the top of the head, which occurred when she struck her head on a conveyor, could or might have been the cause of the difficulties you found with this woman?

"*A.* Yes, sir, I believe it could have been.

"*Q.* Is this woman presently disabled, Doctor?

"*A.* I think there could be a limited type of work that she could perform at the present time. It would be jobs in which she couldn't hurt herself, if she did have a spell. It would be jobs that would not be too fatiguing. I think those are about the main limitations.

"*Q.* I will ask you as to whether or not she can compete with an ablebodied person in the general field of common labor?

"*A.* No, sir. I don't believe she could do that.

"*Q.* Doctor, this case has been partially tried on 2 different dates, and the lay testimony put in on October 5, 1953, and December 7, 1953. Assume, Doctor, that on these dates mentioned the proofs indicate that the accident, this traumatic incident, occurred on August 1, 1951 or in November, 1951; I believe the August 1, 1951, date was given to you by the claimant?

"*A.* Yes, sir.

"*Q.* I will ask you as to whether these factors in doubt make any difference in your findings?

"*A.* No, sir.

"*Q.* Does it make any difference in regard to the traumatic causes in this situation?

"*A.* No, sir, it would not.

"*Mr. Feldman:* You may inquire Mr. Crow. * * *

"*Q.* How soon after an injury, as described to you by this patient, would symptoms necessarily manifest themselves?

"*A.* Well, I assume that we should have symptoms very soon after the accident.

"*Q.* By very soon do you mean a matter of hours?

"*A.* Well, it would be hours at the most, and perhaps less than that.

"*Q.* Minutes?

"*A.* Very possibly. I should qualify that a little bit. You know we do see delayed reaction in some of these head injuries which may be because they have a little blood around the brain and it isn't until the blood which is there breaks down that they get severe symptoms. But they most always have severe symptoms soon. But more may develop later.

"*Q.* Assume for the purpose of this question that Mrs. Hollingsworth sustained a blow to the top of her head on August 1, 1951; and that she continued to work without significant interruption until December 6, 1951; would you feel that the blow on her head, in view of that incident on August 1, 1951, could still be a cause of the condition you observed?

"*A.* Well, if she continued to work with no apparent difficulty then I would find it hard to believe that the changes took place from the blow."

While no brief has been filed on behalf of defendant, it appears from the record that the issue probably most strongly stressed by defendant is whether the injury in question occurred on August 1, 1951 or in November, 1951.

Through the testimony of Louise Brand, defendant's records signed by plaintiff's husband were produced setting forth that a blow to the head was received August 1, 1951 (defendant's exhibit 2) and that plaintiff strained her right shoulder on November 1, 1951, which was reported on November 7, 1951 (defendant's exhibit 1). Louise Brand testified that plaintiff came in to first aid on August 1, 1951 and said that she had bumped her head; that she had not mentioned bumping her head on any other occasion; that the forms for the records mentioned were filled out by the nurse as to name, clock number, date of injury and date injured worker came to first aid but that the foreman was supposed to fill in the explanatory portion and sign name.

Plaintiff testified that the injury occurred on the Wednesday before Thanksgiving; that the reason she

was so very sure was that she remembers stating how fortunate it was that it happened on a week end so that she could be in bed and not miss work, and that there was no possibility that this injury occurred in August, 1951.

James Hollingsworth testified that the injury occurred at Thanksgiving time; that he had signed an injury report; that he was not plaintiff's foreman as of August 1, 1951 and did not become foreman on plaintiff's shift until October 1, 1951 and that the date of August 1, 1951, on defendant's exhibit 2 was inaccurate. He was defendant's agent who signed the report the date of which is in question.

Jacquelyn Zerlut, office secretary for Local 793, UAW-CIO, testified as follows:

"*Q.* Did she describe this injury to you?

"*A.* Yes.

"*Q.* And what did she tell you?

"*A.* She said that—she said she didn't feel good and I said in what way, what kind of a condition do you think, what is the cause of your not feeling well? She said she had terrific headaches so I said, 'Well, you go to your doctor and get your claim filled out and take it out to Auto's and then bring it back to me.' So she did. I think Dr. Reed was the first one. Well, it come back and he said, if I remember correctly, his form said that she had a bulge over the right ear, hypertension and migraine headaches. Well, then I said, 'What do you mean about this bulge over the right ear?' She said that was from this hit on the head. I said, 'We can't put it through the insurance program if it was caused from an injury in the plant.' She said—I said, 'I will have to get in touch with the nurse at Riverside.' So I called Louise and Louise told me that—

"*Q.* This is Louise Brand?

"*A.* Yes. I said, 'Have you ever heard of Maxine Hollingsworth getting hit in the head?' And she said yes. But that is all that was said. I said, 'Well, it looks like it is a compensation case to me.' Well, she said, 'We got to have a lot more information than

we got now.' And I said, 'Well, I am going ahead and send this through to the insurance company and we will see what happens.' And I said to Maxine at the time, I said, 'Listen, you had better make contact on getting this report down to Adler.' And she wouldn't do it because James was a foreman. She said, 'I don't want to jeopardize James' position.'
* * *

"*Q*. But you advised her to make a claim for this head injury and she refused to do so until she came back?

"*A*. That's right.

"*Q*. And when did you first advise her to make a claim?

"*A*. I told her right when she told me she got hit on the head, it wasn't over 6 weeks after she had been hit.

"*Q*. That would have been back in '51?

"*A*. That's right. It was either the last of December, '51 or January, '52."

We further find as follows: Plaintiff sustained a brain injury on or about November 28, 1951, when she was struck in the head by a conveyor while endeavoring to go under a conveyor line. This injury did not occur on or about August 1, 1951. Records of defendant in this regard are erroneous. The testimony of plaintiff, her husband and Jacquelyn Zerlut is convincing as to date of injury. As the direct result of such injury plaintiff has been totally disabled from December 6, 1951 to March 3, 1952, and from March 25, 1952, to the date of hearing from doing the work she was performing for defendant prior to the accidental injury. Plaintiff was still so disabled at the time of hearing and a continuing award is fully warranted and justified.

At the time of injury plaintiff's average weekly wage was $60. Her work was common labor. Plaintiff had no dependents.

Plaintiff is entitled to receive compensation for total disability at the rate of $24 per week from December 6, 1951 to March 3, 1952, and from March 25, 1952, until further order of the workmen's compensation department.

The award of the hearing referee finding that a personal injury occurred on August 1, 1951, but that plaintiff's condition is not causally related to the injury shall be reversed.

\*        \*        \*

This concludes the opinion of the appeal board.

Defendant in its appeal here urges, in substance, that the appeal board erred as a matter of law in the following particulars: in finding that a timely report* was made of the accident; in finding that a timely claim* was made; in finding that an award was not barred by "horseplay"; in basing a continuing award of total disability dated January 29, 1957, solely upon medical evidence last given on June 9, 1954; in failing itself to order further medical proofs or to give defendant an opportunity to rebut this obsolete medical evidence; in thus failing to observe the requirements of due process; in thus denying defendant due process; and in making such award without any evidence to support its findings.

The first 2 grounds of error (plaintiff's claimed failure to timely report and make claim) arise out of sharply disputed questions of fact. Some of the extensive testimony on this score is mentioned briefly in the foregoing quoted opinion. We see no occasion to review all of it. It is undisputed that the employer did not file a report of the injury. We find that there is competent evidence in the record to support the findings made on these issues. To point up our role in these circumstances we may add that we think there was probably also competent evidence

---

* See CL 1948, § 412.15 (Stat Ann 1950 Rev § 17.165).—REPORTER.

in the record to have supported a contrary finding. The credibility of the witnesses is not for us to pass on. Since under these circumstances no questions of law are involved (to which we are thus by statute restricted), we must therefore hold that these grounds of error are without merit (CL 1948, § 413.12 [Stat Ann 1950 Rev § 17.186]).

On the "horseplay" issue there was some testimony brought out before the referee, mostly from the plaintiff and her husband, that the reason she may have bumped her head was because an unknown young boy might at the time have been "riding" the loaded overhead conveyor line (contrary to his duties and safe practice) who suddenly let go, thus abruptly lowering the temporarily tautened portion of the heavy conveyor under which plaintiff was passing and precipitating the results. The appeal board found otherwise, likewise based upon some evidence, but we choose not to ignore this argument by taking the easy way out. There is much talk in the briefs about possible condonation of this practice by the employer and other similar "case-made" considerations which we have from time to time ingeniously grafted on this likewise ingenious case-made escape hatch from employer liability. There was no evidence whatever that the plaintiff participated in this horseplay, if any existed. This case thus presents neither the time nor sufficient factual occasion for us to take a long hard look at our former horseplay and related decisions, but whatever our rule may have been in the past, we think we can state with some degree of confidence that, even if horseplay had clearly existed here on the part of the boy, in this case and in future cases like it, the nonparticipating employee will not be barred from recovery for that reason alone. This ground of error is accordingly without merit.

Appellant urges that our decision in *White* v. *Michigan Consolidated Gas Co.*, 342 Mich 160 is decisively controlling upon its argument that the appeal board lacked sufficient medical and other evidence to base the award it made in our case on January 29, 1957, in turn based upon testimony as to physical condition and consequent disability made not later than June, 1954, over 2-1/2 years before. That is indeed a long time, and we find that in the *White Case* there was also an extended delay between the last medical evidence on disability taken before the hearing referee (involving an injured knee) and the appeal and final reversal of the award by the appeal board. We there grounded our decision on a finding that the record then before the appeal board failed to contain any competent evidence to sustain a finding of continuing disability.

In that case the referee's award (reversed by the appeal board) found that the claimant's disabilities had ceased. Here the referee's award (which was also reversed) found that her "present condition is not causally related to the accidental personal injury of August 1, 1951." The referee in our case did not attempt to appraise or pass on that "present condition." The reversal here, then, was not a reversal of, or grounded upon, the fact of no disablement, but rather on the issue of the date and the causal connection of plaintiff's undefined present condition with the injury. (It perhaps might be said that the conflicting testimony before the referee was on these issues "frozen" testimony of a kind which manifestly could not change for better or worse no matter how much time elapsed between its utterance and an adjudicative determination and application of such testimony.) We find that there was competent evidence to sustain the findings of the appeal board on these disputed issues. We shall now pass to the

pricklier question of whether there was sufficient evidence to justify the award of the appeal board without the necessity of taking additional medical or other testimony subsequent to the award of the referee made in June, 1954, based upon Dr. Feferman's deposition taken earlier the same month.

Before doing so we note that the same *White Case* is once again before us. At this writing our decision therein has not been handed down.* There the plaintiff who lost here in the first case turned around and filed for further compensation, further testimony was taken, and an award for plaintiff has again been appealed here. That we might remand the case at bar, or possibly hold that what was later done by the losing employee in the first *White Case* might be done by the plaintiff here is, of course, no answer to this appellant, if it is right. On the other hand the fact that the plaintiff may possibly pursue other courses is no reason alone for us to reverse the award in this case, if, when it was made, it was based upon sufficient competent evidence, including that of continued disability. We turn to that question.

While we think there are situations where our holding in the first *White Case* may properly apply, and we do not seek to overrule that case, this is not to subscribe to the evidently growing notion in some quarters that our decision in that case means that the appeal board in workmen's compensation cases must, henceforth, in every instance have spanking-fresh testimony before it before it dare make any findings or reach a contrary award. We find nothing in the *White Case* or the act to sustain any such necessity and we do not want lightly to get abroad the notion that the appeal board must in every case resort to the cumbersome and delaying (and expensive) expedient of taking or permitting the taking of

---

* See *White* v. *Michigan Consolidated Gas Co.*, 352 Mich 201.—Reporter.

additional testimony in order either to affirm or up-
set any findings or awards made by the referee.
Simplicity and dispatch were once, at least, supposed
to be twin goals of the administration of this act.
That dispatch may necessarily occasionally suffer is
no reason to in turn forsake simplicity. A simple
rule is for us to look and see whether the appeal
board had any competent evidence before it to sup-
port its findings and doings. That was the *White
Case*. That is our case. That is our understanding
of the law.

Thus, to take an extreme example, no one would
seriously claim that any such need for further medi-
cal testimony existed where an employee was ren-
dered legless and armless, say, by his accident and
an appeal was made on some grounds or other fol-
lowed by a considerably delayed award of total dis-
ability. The point is that obviously, in such a situa-
tion, there could be no future improvement. But if
that example, as it might be, is deemed loaded and
weakened by the fact that disability there is created
by conclusive legislative presumption by statutorily
declared effect of specific loss, obviously requiring
no further "judicial" proofs, then let us assume a
situation that involves, say, the wasting away or loss
of a "nonspecific-loss" portion of the body.

That is apparently precisely what happened here.
At least that is what the only proofs offered below
tend to indicate. There is the elaborate and rather
harrowing testimony of the plaintiff and her husband
as to her progressively worsening condition, which
we need not review. Most significant, the only medi-
cal testimony in the case appears to point steadily
to the fact that this plaintiff had irretrievably lost
a vital portion of her body, namely, a portion of her
brain; that is, if we concede that the "atrophy" of
a portion of the brain testified to by Dr. Feferman
properly means a "wasting away of a part or parts

of the body" (Thorndike-Barnhart dictionary) or "a wasting away from want of nourishment; diminution in bulk or slow emaciation of the body or of any part." (Webster's New International dictionary) We observe that the idea of irretrievable loss, of continued degeneration, of progressive wasting and diminution is implicit in these definitions.

It would seem that if this particular atrophy or wasting away of a portion of the plaintiff's brain could have resulted from this accident and could also properly be said back in 1954 to have been followed by the impairment of bodily functions and consequent inability to work as also then testified to by Dr. Feferman (the correctness of which is not for us to pass on), then it would seem necessarily to follow that her condition and disability therefrom at *that* time would not only continue but inevitably get worse, not better, as time and the wasting process went on. If so, it would also appear to follow that there would exist no need for the taking of further medical or other proofs on that score. Since the woman could not improve no gainful probative purpose could possibly be served by showing (at least before the appeal board) that she may have got worse, there being no compensable disability possible beyond that already testified to before the referee and found by the board. Under these circumstances if 10 doctors had been permitted to testify otherwise concerning plaintiff's condition and disabilities on the very day before the award of the appeal board, we still could not upon review rightfully say that the board lacked any competent evidence before it to make the finding it made.

Having said all this, however, that still is no reason to foreclose this appellant from properly presenting its own medical case, whether by 1 doctor or 10 and however needless or futile, if it had a right to do so and which right was without its fault denied it by

the appeal board. That is equally plain. But if, as we have just indicated, the board had before it competent evidence upon which to base its findings we do not think that it was up to the board either to instruct the appellant on available procedures or on its own motion order the taking of further medical testimony "in the furtherance of justice." (Rule 9 of the workmen's compensation commission* provides: "The commission may order the taking of additional testimony, either on its own motion or on the application of 1 or both of the parties when it considers that such action shall be taken in the furtherance of justice.")

The deposition of Dr. Feferman on behalf of plaintiff was the only medical testimony produced before the referee and the appeal board. The appellant now complains for the first time before us (and the appellee disputes) that following adjournment of a second continued hearing before the referee it had not fully completed its own proofs before the referee before the latter up and found in appellant's favor, whereupon, evidently flushed with victory, it concluded to let the matter pass. It is fair to say that the situation was on this point left somewhat ragged and ambiguously suspended before the referee; there are some indications both ways. Right or wrong, at least the referee himself appears to have thought the case was submitted. In any event we think this is a question we need not resolve. In such a situation and upon appeal by the losing plaintiff we think this was all the more reason that the present appellant should itself have timely brought up the subject and, more important, also have timely besought the appeal board to permit the taking by appellant of further medical proofs under the same rule, which right it had but failed to exercise. Instead it now belatedly

---

* See 1954 Administrative Code, R 408.9, p 4502.—REPORTER.

seeks to ascribe its failure to its apparent settled confidence that the board would not reverse, and at least not without first giving appellant a chance to put in rebuttal medical proofs.  As we have seen, appellant's earlier elation over victory proved as costly as its later trust and confidence in what the appeal board would do proved excessive.  While appellant's actions are not entirely unununderstandable, under these circumstances we still think the consequences of its failure to avail itself of the procedures plainly open to it should not be visited on this plaintiff.  By the same token such failure did not constitute so much a denial of due process as possibly faulty guesswork and unwarranted over-confidence on the part of the appellant itself—and perhaps too much strategic reliance upon the *White Case.*  This view is not weakened when we further observe that much of the delay in the decision of the appeal board appears, in part at least, ascribable to the additional failure of the appellant to file any brief before that body during the same period.  We cannot encourage litigants to "lie in the weeds" hopefully awaiting a favorable decision and then, when they lose, urge their own procedural lapses and delays—and possible misfired strategems—as a denial of due process or as thus alone causing a fatally excessive remoteness between the taking and adjudicative application of proofs.  We find and hold that in this case there was timely and competent medical and other testimony in the record before the appeal board to sustain the finding and the award made by it.  That award must therefore be affirmed, with costs to the appellee.

SMITH, BLACK, EDWARDS, and KAVANAGH, JJ., concurred with VOELKER, J.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred in the result.